**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| C.D., *a minor, by and through his Guardians ad Litem, Michael and Holly Daily,*<br><br>Plaintiff,<br><br>v.<br><br>STANISLAUS UNION SCHOOL DISTRICT,<br><br>Defendant. | Case No.  1:22-cv-01389-SKO<br><br>**ORDER RE CROSS MOTIONS FOR SUMMARY JUDGMENT; ORDER RE MOTION TO SUPPLEMENT**<br><br>(Docs. 20, 21, 22) |

## I.      INTRODUCTION

On October 27, 2022, Plaintiff C.D., a minor, by and through his Guardians ad Litem, Michael and Holly Daily (the "Plaintiffs") filed this action against the Stanislaus Union School District (the "District" or the "Defendant").  This case presents a blended administrative appeal and civil action, as Plaintiffs seek review of a state administrative decision under the federal Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq*., (the "IDEA") (Count I) and damages for alleged disability-based discrimination under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.* (Count II), and Section 504 of the Rehabilitation Act of

1973 ("Section 504"), 29 U.S.C. § 794,  (Count III) and as well as damages for alleged violations of Section 504's implementing regulations (Count IV).

The District filed a motion for summary judgment (Doc. 20) on April 8, 2024, and Plaintiffs filed their opposition on April 22, 2024.  (Doc. 27).  The District replied on May 2, 2024.  (Doc. 31).  Plaintiffs filed a motion to supplement the administrative record (Doc. 21) and a motion for summary judgment (Doc. 22) on April 8, 2024.  Defendant filed its oppositions (Docs. 25, 26) on April 22, 2024, and Plaintiffs replied on April 29, 2024.  (Docs. 27, 28).[1]

Upon consideration of the motions and the administrative record, and for the reasons discussed below, the Court DENIES Plaintiffs' motion to supplement the record.  (Doc. 21).  The Court also DENIES Plaintiffs' motion for summary judgment (Doc. 22) and GRANTS the District's motion for summary judgment (Doc. 20).

## II.     BACKGROUND

### A.     Factual Background

C.D. began receiving special education services in 2012 as a preschooler.  (*See* AR 4, 1095).  This appeal centers on the services provided by Defendant during the 2019-2020 and 2020-2021 school years when C.D. was in fifth and sixth grade, respectively.  (*See* AR 1978).  At all relevant times, C.D. was eligible for special education services under the categories of Autism and Specific Learning Disability ("SLD").  (AR 1095, 1306).   Under California regulations, SLD is a "disorder in one or more of the basic psychological processes involved in understanding or in using language, spoken or written, that may have manifested itself in the imperfect ability to listen, think, speak, read, write, spell, or do mathematical calculations," and it may include conditions like dyslexia.  Cal. Code Regs., tit. 5, § 3030(b)(1).  His diagnoses caused him to struggle with academics and off-task behavior.  (*See generally* AR).  C.D. disenrolled from the District on May 28, 2021, at the end of his sixth-grade year.  (AR 251).  During the 2021-2022 school year, he enrolled with Aspire Vanguard College Preparatory

---

[1] The parties have consented to the jurisdiction of U.S. Magistrate Judge Sheila K. Oberto.  (Docs. 11-13).

Academy, a local educational agency ("LEA") unaffiliated with the District.  (AR 1332).  At the time of the administrative hearing, C.D. was a 13-year-old seventh-grade student.   (AR 1857).

### 1.    Schooling During the COVID-19 Pandemic

On March 19, 2020, the California governor closed all public schools in the state to curb the spread of the novel coronavirus, called COVID-19.  (AR 1991).  From March 30 to April 19, 2020, the District provided remote, asynchronous instruction.  (AR 1991).  Asynchronous instruction "permits the students to learn on their own schedule using classroom materials, within a certain timeframe."  (AR 1992).  Synchronous instruction requires students "to attend a class session daily or weekly at the same time as the instructor and other classmates using teleconference technology."  (AR 1992).

From April 20, 2020, through the end of the school year, the District provided remote learning through synchronous instruction.  (AR 1992).  When school resumed on August 10, 2020, the District provided remote learning through asynchronous instruction. (AR 1992).  From October 12, 2020, through December 21, 2020, students attended classes in-person two times per week and received remote learning three times per week.  (AR 1992).  After winter break, beginning on January 11, 2021, through February 12, 2021, students resumed remote-only learning.  (AR 1992).  Students then returned to in-person instruction full-time.  (AR 1992).  An individual aide virtually accompanied C.D. via videoconference during his remote, synchronous instruction.  (AR 1992).

### 2.    The February 20, 2020, and April 23, 2020, IEP

The District held an IEP meeting for C.D. on February 20, 2020, and April 23, 2020, which Plaintiffs attended.  (AR 1095).  His mother expressed a concern with his educational gap, stating that she wanted him to receive a diploma and graduate.  (AR 1097).  She requested testing to know "what type of learner he was" and whether he should be tested for Dyslexia or another specific learning disability.  (AR 1097).

Plaintiffs and Defendant developed ten goals in the areas of reading fluency, reading comprehension, written language, phonological coding, math, perspective-taking, behavior and executive functioning. (AR 1107-1117).  The IEP team proposed C.D. receive various additional

special education services, including specialized academic instruction ("SAI") for 45 minutes weekly; intensive individual services during core instruction, which included an individual behavior aide for 210 minutes daily; and SAI for reading, writing, and math in the Learning Center for 685 minutes weekly. (AR 1118-1119). The IEP also included a behavior intervention plan. (AR 1084).

### 3.   The September 3, 2020, IEP Addendum

Defendant met with Plaintiffs during a September 3, 2020, meeting to review C.D.'s IEP. (AR 1168). During the meeting, much of the discussion revolved around how C.D. had adjusted to and how the District had implemented remote learning in response to the COVID-19 pandemic. (*See* AR 1168-73). Generally, C.D. struggled during distance learning. C.D.'s mother reported that he was distracted at least 25 times per hour and that she had to take notes for him. (AR 1168). District staff also witnessed C.D. pinch and/or hit his mother during Zoom sessions. (AR 3028).

During the September 2020 IEP, C.D.'s parents expressed concern about C.D.'s learning loss because of distance learning. (AR 1168). While Plaintiffs requested an in-person aide at their home (which the District had previously stated it would provide under the distance learning model), the District denied the request because it was not permitted to re-open for in-person services. (AR 1168-69). C.D., however, had a school aide who "accompanied" him remotely when he received synchronous instruction by Zoom. (AR 1160, 1180, 2458). The parties discussed various ways to help C.D. manage distance learning, like additional Zoom sessions and breakout sessions. (AR 1168). The IEP identified that C.D. needed more emotional support, and his classroom teacher agreed to create more opportunities to allow students to "chat." (AR 1168). The parties agreed that the Learning Center would provide the following:

> Learning Center teacher will provide additional curriculum for home to be picked up by parent during distribution day, expanded Zoom sessions in the Learning Center, a new schedule for mom for Tuesday. Classroom teacher will provide math notes and also have [C.D.] join an additional session for social emotional support and push out recorded math Zoom sessions. BC8A will drop off a chart for parent to use for positive feedback with [C.D.].

(AR 1168).   The District also updated its intervention plan to help address C.D.'s behaviors during distance learning.  (AR 1173-77).

**4.      The February and March 2021 IEP**

The District held C.D.'s 2021 annual IEP team meeting on February 18 and March 2, 2021.  (AR 1857-1916).  Plaintiffs attended the meeting, along with their independent assessor, Dr. Mitchel Perlman, C.D.'s attorney, and C.D.'s aunt.  (AR 1862, 1867).

Dr. Perlman shared that based on his private evaluation, C.D. had dyslexia.  (AR 1862). He expressed concern that without additional intervention, C.D. would be a non-reader as an adult.  (AR 1862).  Plaintiffs also shared their concerns for C.D.'s lack of progress, noting he had been more aggressive at home while his deficits in reading and math worsened.  (AR 1862).  Dr. Perlman noted that in his opinion, based on the files he reviewed, the District had not identified what weaknesses were causing the reading problem.  (AR 1599).

C.D. had met the goals set at his 2020 IEP team meeting in reading fluency, reading comprehension, writing paragraphs, written language, math reasoning, and grammar.  (AR 1880-1885).   C.D. did not meet his goals in ELA, social behavior, behavior or executive function. (AR 1880-89).  The IEP team developed new goals for C.D. in fluency, reading comprehension, written language, basic reading phonological awareness, math, sequential processing, executive functioning, classroom behavior, social awareness, and social behavior.  (AR 1890-1900).  The IEP proposed C.D. would receive the following services:  SAI for 45 minutes weekly; intensive individual services, consisting of an individual behavior aide for 210 minutes daily; SAI for reading, writing, and math, provided in the Learning Center, for 895 minutes weekly; and behavior intervention services for 30 minutes monthly.  (AR 1901-02).  This represented an increase in services from the previous year.

District special education teacher Stacey Rapisura testified that the services were increased to help C.D. meet his "challenging" goals.  (AR 1983).  During C.D.'s time in the District, the District provided evidence-based programming including Read Naturally, Read 180, System 44, Fast Forward, Language Live!, and Step Up to Writing to address C.D.'s delays in reading and writing.  (AR 2984-2988, 3014-3015, 3067-3075).  It provided Excel Math, Touch

Math, Moby Max, and Eureka Math programs to address C.D.'s math deficiencies.  (AR 3067-3075).

## C.    Procedural History

Plaintiffs initiated a due process complaint and request for mediation on April 6, 2022, alleging the District denied C.D. a free appropriate public education ("FAPE") during the two-year relevant statutory period.  (AR 1-52).  The District filed a response on April 19, 2022.  (AR 96-117).  The parties appeared by teleconference in front of an Administrative Law Judge (an "ALJ") over the span of eight days in May and June 2022.  (*See* AR 1977).  Fifteen witnesses, including five experts, testified at the hearing.  (*See* AR 1977-1978).  The three issues before the ALJ were as follows:

(1) Did Defendant deny C.D. a FAPE from April 6, 2020, through the end of the 2019-2020 school year by failing to offer:

    a.   Appropriate goals, supports, and services for academics;

    b.   Appropriate goals, supports and services for behavior;

    c.   Appropriate goals, supports, and services for executive functioning;

    d.   Appropriate goals, supports, and services for pragmatic language;

    e.   Goals and services for fine motor; and

    f.   Assessment in the area of fine motor?

(2) Did the Defendant deny C.D. a FAPE during the 2020-2021 school year by failing to offer:

    a.   Appropriate goals, supports, and services for academics;

    b.   Appropriate goals, supports and services for behavior;

    c.   Appropriate goals, supports, and services for executive functioning;

    d.   Appropriate goals, supports, and services for pragmatic language;

    e.   Goals and services for fine motor; and

    f.   Assessment in the area of fine motor?

(3) Did Defendant deny C.D. a FAPE by failing to provide an appropriate prior written notice in response to his parents' April 18, 2021, consent-with-exceptions communication?

(AR 1978).  The ALJ issued a written decision on July 29, 2022.  (AR 1977-2047).  The ALJ denied relief to Plaintiffs on Issues #1 and #2 and granted Plaintiffs relief on Issue #3.  On October 27, 2022, Plaintiffs timely appealed with respect to Issues #1 and #2.

1

### III.   LEGAL STANDARD

2

#### A.   The IDEA Appeal

3   As the Ninth Circuit has noted, "[j]udicial review under the IDEA is an odd creature in

4   administrative law." *Los Angeles Unified Sch. Dist. v. A.O. by & through Owens*, 92 F.4th 1159,

5   1168 (9th Cir. 2024).  "The review is not limited to the administrative record, nor does the court

6   try factual issues de novo."  *Id.*  A reviewing court must receive the records of the administrative

7   proceedings, hearing any additional evidence at the request of a party, and base its decision on

8   the preponderance of the evidence.   20 U.S.C. § 1415(i)(2)(c)(i)-(iii); *see also E.V.E. v.*

9   *Grossmont Union High Sch. Dist., No. 22-CV-941-RSH-BGS*, 2023 WL 5635728, at *5 (S.D.

10   Cal. Aug. 31, 2023) (treating cross-motions for summary judgment as an appeal of the hearing

11   officer's administrative decision).  The burden rests on the party challenging the administrative

12   decision.  *Capistrano Unified School District v. S.W.*, 21 F.4th 1125, 1133 (9th Cir. 2021) (citing

13   *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 62 163 L.Ed.2d 387 (2005)).

14   In essence, the reviewing court "essentially conduct[s] a bench trial based on a stipulated

15   record."  *Ojai Unified School Dist. v. Jackson*, 4 F.3d 1467, 1472 (9th Cir. 1993).  "Courts must,

16   however, give due weight to judgments of education policy when reviewing state administrative

17   hearing decisions."  *Owens*, 92 F.4th at 1168.  "The deference due to the administrative findings

18   under the IDEA is less than the high standard of deference for judicial review of most agency

19   actions. But we must give 'due weight' to administrative findings, particularly when the findings

20   are 'thorough and careful.'"  *Doug C. v. Hawaii Dept. of Educ.*, 720 F.3d 1038, 1042-43 (9th Cir.

21   2013) (internal quotation marks and citations omitted).  A court may "treat a hearing officer's

22   findings as thorough and careful when the officer participates in the questioning of witnesses and

23   writes a decision containing a complete factual background as well as a discrete analysis

24   supporting the ultimate conclusions."  *R.B.*, 496 F.3d at 942.

25

#### B.   Rule 56 Summary Judgment Standards

26   Summary judgment/adjudication is appropriate when the pleadings, disclosure materials,

27   discovery, and any affidavits provided establish that "there is no genuine dispute as to any

28   material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

A material fact is one that may affect the outcome of the case under the applicable law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party."  *Id.* (internal quotation marks and citation omitted).

The party seeking summary judgment/adjudication "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  The exact nature of this responsibility, however, varies depending on whether the issue on which summary judgment/adjudication is sought is one in which the movant or the nonmoving party carries the ultimate burden of proof.  *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  If the movant will have the burden of proof at trial, it must demonstrate, with affirmative evidence, that "no reasonable trier of fact could find other than for the moving party."  *Id.*  In contrast, if the nonmoving party will have the burden of proof at trial, "the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." *Id.* (citing *Celotex*, 477 U.S. at 323).

If the movant satisfies its initial burden, the nonmoving party must go beyond the allegations in its pleadings to "show a genuine issue of material fact by presenting affirmative evidence from which a jury could find in [its] favor." *FTC v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009).  "[B]ald assertions or a mere scintilla of evidence" will not suffice in this respect. *Id.* at 929; *see also Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.").  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

In resolving a summary judgment/adjudication motion, "the court does not make credibility determinations or weigh conflicting evidence." *Soremekun*, 509 F.3d at 984.  That

remains the province of the jury or fact finder.  *See Anderson*, 477 U.S. at 255.  Instead, "[t]he evidence of the [nonmoving party] is to be believed, and all justifiable inferences are to be drawn in [its] favor."  *Id.*  Inferences, however, are not drawn out of the air; the nonmoving party must produce a factual predicate from which the inference may reasonably be drawn.  *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898 (9th Cir. 1987).

## IV.    DISCUSSION

### A.    The IDEA Appeal

Congress enacted the IDEA "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living."  20 U.S.C. § 1400(d)(1)(A).  To receive federal funds, states agree to provide a "free appropriate public education" (a "FAPE") to all children from ages 3 to 21 with disabilities residing in the state.  § 1412(a)(1)(A).  A FAPE is defined as "special education and related services that—(A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards of the State educational agency; (C) include an appropriate pre-school, elementary school, or secondary school education in the State involved; and (D) are provided in conformity with the individualized education program required under section 1414(d) of this title."  20 U.S.C. § 1401(9).

To provide a FAPE to students with disabilities, states first identify and evaluate children with disabilities.  *Crofts v. Issaquah School District No. 411*, 22 F.4th 1048, 1054 (9th Cir. 2022).  "Once identified, those children must be evaluated and assessed for all suspected disabilities so that the school district can begin the process of determining what special education and related services will address the child's individual needs."  *Timothy O. v. Paso Robles Unified School Dist.*, 822 F.3d 1105, 1110 (9th Cir. 2016) (citing 20 U.S.C. §§ 1412(a)(7), 1414(a)-(c)).

Parents and schools then work together to craft an individualized education program (an "IEP").  *K.D. ex rel. C.L. v. Dep't of Educ.*, 665 F.3d 1110, 1114 (9th Cir. 2011) (citing *Schaffer*

*v. Weast*, 546 U.S. 49, 53 (2005)).  "The IEP is the centerpiece of the statute's education delivery system for disabled children." *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 391 (2017) (quotations omitted).  The IEP is "a written statement for each child with a disability that is developed, reviewed, and revised in accordance with [the law]."  20 U.S.C. § 1401(14).   Every IEP "must include an assessment of the child's current educational performance, must articulate measurable educational goals, and must specify the nature of the special services that the school will provide."  *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 53 (2005); 20 U.S.C. § 1414(d)(1)(A)(i).  The IEP must be reasonably calculated to enable the child to receive "meaningful" education benefit.  *N.B. v. Hellgate Elementary Sch. Dist., ex rel. Bd. of Dirs., Missoula Cnty., Mont.*, 541 F.3d 1202, 1212–13 (9th Cir. 2008); see U.S.C. § 1414(d)(1)(A).

To resolve any disagreements between parents and school officials regarding a child's IEP, the IDEA provides that parties are first encouraged to resolve their dispute through mediation.  20 U.S.C. § 1415(e).  If mediation fails, parties are entitled to an impartial due process hearing conducted by the local or state educational agency. § 1415(f)(1)(A). Any party dissatisfied with the outcome of the state administrative hearing may seek review in a federal district court. § 1415(i)(2)(A).

Before addressing the parties' arguments related to the merits of Plaintiffs' IDEA claim, the undersigned will address (1) Plaintiffs' Motion to Supplement the Record (Doc. 21), and (2) whether the ALJ's findings are "thorough and careful," and therefore owed deference.  *R.B., ex rel. F.B. v. Napa Valley Unified School Dist*., 496 F.3d 932, 937 (9th Cir. 2007).

### 1.    Motion to Supplement the Record

Plaintiffs seek to supplement the Administrative Record with two documents: (1) a Spring 2023 assessment by private educational specialist Seanessy Gavin and (2) the parents' Consent with Exceptions (the "CWE") to the Spring 2021 IEP that was admitted into evidence by the California Office of Administrative Hearings ("OAH") but omitted from the administrative record on appeal.  (Doc. 21-1 at 3-4).  The District only opposed the former.  (Doc. 25 at 1).  Accordingly, Plaintiffs' motion is GRANTED with respect to the CWE.

When reviewing an IDEA appeal, the court "shall hear additional evidence at the request of a party." 20 U.S.C. § 1415(i)(2)(C)(ii). "Additional" evidence means "supplemental." *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1473 (9th Cir. 1993).

> The reasons for supplementation will vary; they might include gaps in the administrative transcript owing to mechanical failure, unavailability of a witness, an improper exclusion of evidence by the administrative agency, and evidence concerning relevant events occurring subsequent to the administrative hearing. The starting point for determining what additional evidence should be received, however, is the record of the administrative proceeding.
>
> The determination of what is "additional" evidence must be left to the discretion of the trial court which must be careful not to allow such evidence to change the character of the hearing from one of review to a trial de novo.

*Id.* (citation and ellipses omitted). "[E]vidence that is non-cumulative, relevant, and otherwise admissible constitutes 'additional evidence' that the district court 'shall' consider pursuant to 20 U.S.C. § 1415(i)(2)(C)(ii)." *E.M. ex rel. E.M. v. Pajaro Valley Unified Sch. Dist. Office of Admin. Hearings*, 652 F.3d 999, 1005 (9th Cir. 2011).

Defendant contends the Court should deny Plaintiffs' request because it violates this Court's Scheduling Order (Doc. 19), and because the motion is untimely, the District has been prejudiced by its inability to engage in discovery to test the accuracy of the report. Alternatively, the District argues the report is irrelevant, as "[a]s academic progress, or regression, is . . . inexorably intertwined with classroom instruction," and Ms. Gavin administered her assessment nearly two years after C.D. left the District. (Doc. 25 at 5).

Plaintiffs do not dispute their motion is untimely. On March 10, 2023, the Court set an initial disclosures deadline for March 16, 2023, a fact discovery deadline for December 21, 2023, and an expert disclosure deadline for March 11, 2024. (Doc. 19). The Scheduling Order also required all non-dispositive pre-trial motions to be filed by March 18, 2024. (Doc. 19). Plaintiffs filed its Motion to Supplement the Administration Record on April 8, 2024. (Doc. 22). Plaintiffs did not include Ms. Gavin as an individual with knowledge of the issues in this litigation in their initial disclosures, nor was she disclosed in Plaintiffs' expert disclosures.

Plaintiffs contend, however, that the District was on notice that Plaintiffs intended to supplement the record with a private assessment. (Doc. 29 at 2). In Plaintiffs' initial disclosures,

they noted that discovery would include "[p]rivate testing and/or tutoring after due process litigation (including evidence to be introduced via a motion to supplement the administrative record)." (Doc. 25-1 at 6).  They now argue the District would not suffer an actual prejudice if the Court granted the motion.  (Doc. 29 at 2).  Plaintiffs' have not demonstrated why they did not seek to supplement the administrative record until nearly a year after Ms. Gavin conducted her assessment.

Plaintiffs also cite to *J.B. v. Tuolumne Cty. Superintendent of Sch.*, 2020 WL 3287365 (E.D. Cal. June 18, 2020) in support of their contention that the Court may admit Ms. Gavin's declarations for the purpose of establishing remedies.  While it is true that a Court shall consider non-cumulative, relevant, and otherwise admissible evidence when reviewing an administrative decision in an IDEA case, (*E.M.*, 652 F.3d at 1004-05), Plaintiffs' reliance on *J.B.* is misplaced.  First, in *J.B.*, the magistrate judge recommended admitting supplemental evidence for the purpose of fashioning a remedy (as opposed to resolving the underlying FAPE issue).  *J.B.*, 2020 WL 3287365, at *21.   Despite contending otherwise, Plaintiffs do not intend to use its supplemental evidence so narrowly, as they argue Ms. Gavin's declarations show "C.D. remains direly and tragically behind in his academic progress."  (Doc. 21-1 at 6).  Secondly, the District Court ultimately denied the magistrate judge's recommendation in *J.B.*, and instead held that "the evidence is cumulative of evidence in the record and/or only tangentially relevant to the issue for which it was considered."  *J.B. ex rel. Billiet v. Tuolumne Cnty. Superintendent of Sch.*, 2021 WL 1221468, at *8 (E.D. Cal. Mar. 31, 2021).  Like in *J.B.*, Ms. Gavin's report is only tangentially relevant to the issues at hand, and to the extent it demonstrates that C.D. is behind academically, the evidence is cumulative.

Accordingly, the Court will DENY IN PART Plaintiffs' Motion to Supplement the Administrative Record with respect to Ms. Gavin's report and declarations (Doc. 21).[2]

---

[2] Plaintiffs also cite to the California Dyslexia Guidelines (the "Guidelines") a non-binding guidance document published by the California Department of Education ("CDE"), though they do not seek judicial notice of these guidelines, nor do they include these guidelines in their motion to supplement the record.  The Guidelines, by their own admission, are "not binding on local educational agencies."  To the extent the Court may find them relevant, the Court recognizes they are not binding.   California Dyslexia Guidelines, CDE (2017) *available at* https://www.cde.ca.gov/sp/se/ac/documents/cadyslexiaguidelines.pdf.

### 2.     The ALJ Provided a Thorough and Careful Review Owed Deference

At the outset, the Court finds that the ALJ's decision is thorough and careful and therefore subject to special deference under the "modified" de novo standard of review.  *See J.G. v. Douglas Cnty. Sch. Dist.*, 552 F.3d 786, 793 (9th Cir. 2008) ("We give particular deference to 'thorough and careful' administrative findings.") (citing *R.B.*, 496 F.3d at 937)).  The ALJ's 69-page decision contains a detailed factual background and issue-specific analysis, as well as conclusions regarding the credibility of those who testified at the hearing.  The ALJ presided over a hearing that spanned eight days, where fifteen witnesses testified.  (AR 1977-1978).  The ALJ also participated in the questioning of witnesses (*see, e.g.*, AR 2149, 2224, 2322).  Accordingly, the ALJ's decision is owed deference, as it is thorough and careful.  *R.B.*, 496 F.3d at 942.  The Court will not second-guess the ALJ's thorough fact-finding, as discussed below.

Plaintiffs refer to the ALJ's decision as "hurried."  (*See, e.g.,* Doc. 22-1 at 18).  To support their description, Plaintiffs state that "though California law allows up to 45 days, the hurried Decision was issued a mere 18 days from the close of the record following an eight-day hearing with 15 witnesses, including five experts, that generated a 3,768-page record."  (Doc. 22-1 at 12).  This is inaccurate.  Defendant has correctly laid out the timing related to the ALJ's decision as follows:

> California law provides for a total of 45 days from the expiration of the 30-day period described in Education Code 56501.5(c) (relating to the time period for a school district to hold a mandatory resolution session) for OAH to hold a hearing and issue a final decision. Cal. Educ. Code § 56505(f)(3). In other words, OAH has 75 days inclusive of hearing from receipt of a due process request to issue a decision, less continuances for good cause. Here, C.D. filed his due process complaint on April 6. OAH set the matter to commence for hearing on May 24—48 days later. The hearing, itself, took eight days—May 24, 25, 26, and 31, 2022, and June 1, 2, 14, 15, 2022—and then was continued to the filing of closing briefs on July 11. AR 1977 (OAH continues the case during period between hearing days). The time between the filing of closing briefs, and the final decision, was 18 days. Thus, the decision was issued on the *74th day* after filing of the due process complaint (48 days plus 8 days plus 18 days), one day prior to OAH's statutory deadline.

(Doc. 26 at 5-6).  Accordingly, any argument that the ALJ's decision was rushed based on the time allotted under California law is meritless.

### 3.     The District Provided Appropriate Goals, Supports, and Services for C.D. in Academics

Plaintiff contends the ALJ erred in three ways when finding that the District provided C.D. appropriate goals, supports, and services for related to academics: (1) the ALJ disregarded the District's "lack of appropriate training," with regard to dyslexia; (2) the ALJ's decision is contrary to evidence of C.D.'s "glaring" lack of progress, and (3) the ALJ disregarded evidence of the District's inadequate methodology.   The District counters that it appropriately and effectively addressed C.D.'s academic needs.

#### a.   The ALJ Did Not Erroneously Disregard the District's "Lack of Appropriate Training"

Plaintiffs first contend the ALJ improperly disregarded that various District officials, according to Plaintiffs, lacked the appropriate training in dyslexia remediation. (Doc. 22-1 at 12). This argument repeats a sentiment seen throughout Plaintiffs' briefing: that the District failed to provide C.D. a FAPE because it treated his academic deficiencies as resulting from Specific Learning Disability ("SLD") as opposed to dyslexia.   As the Ninth Circuit has noted, this is "a distinction without a difference."   *Crofts*, 22 F.4th at 1055.   Statutorily, SLD encompasses dyslexia (among other conditions).   Cal. Code Regs., tit. 5, § 3030(b)(1); *see also Avila v. Spokane Sch. Dist. 81*, 686 F. App'x 384, 385 (9th Cir. 2017) (rejecting that the district was obligated to test a student dyslexia and dysgraphia because the district assessed the student for SLD).   A district does not fail to provide a student with a FAPE by treating academic deficiencies as SLD instead of dyslexia.   *Crofts*, 22 F.4th at 1055.   Plaintiffs' own expert recommended that "[C.D.'s] special education designation continue to be Autism (AUT) primary and Specific Learning Disability (SLD) secondary."  (AR 1238).

Plaintiffs also contend "[t]he Decision was also neither thorough nor careful in finding that Ms. Rapisura implemented appropriate goals, supports, and services for C.D." (Doc. 22-1 at 17).   Plaintiffs' contentions are unavailing.   The ALJ did not base his decision solely on the testimony of Ms. Rapisura, nor was she solely responsible for ensuring C.D. had access to a FAPE.   Plaintiffs' attempts to undermine Ms. Rapisura's testimony are unpersuasive.   For

instance, Plaintiffs emphasize that Ms. Rapisura does not have training in evidence-based instruction for students with *dyslexia*; however, she is trained to provide evidence-based instruction for students with reading difficulties and has done so since 2004.  (AR 1948). Plaintiffs also contend Ms. Rapisura "stunningly" admitted she is ignorant of "orthography," but she testified that she did not know the *exact definition* of orthography.[3]  (AR 3022).

Plaintiffs also contend Ms. Rapisura testified without corroborating evidence that C.D. could decode words during the 2019-20 school year; however, Dr. Perlman, Carla Priya Tjerandsen (Plaintiffs' educational consultant), and Faun Hyde (C.D.'s inclusion teacher and autism inclusion specialist) had previously found otherwise, thereby corroborating Ms. Rapisura's testimony.  (Doc. 22-1 at 17).  With regard to Dr. Perlman's findings, even assuming Dr. Perlman's properly assessed C.D. (and that it contradicted Ms. Rapisura's testimony) the issue is not whether Plaintiff suffered from academic deficits, but rather, whether C.D.'s IEP was reasonably calculated to enable him to receive a meaningful educational benefit.  *N.B. v. Hellgate Elementary Sch. Dist., ex rel. Bd. of Dirs., Missoula Cnty., Mont.*, 541 F.3d 1202, 1212–13 (9th Cir. 2008).  As repeatedly noted, Dr. Perlman did not recommend or criticize any methodology employed by the District.

With regard to Ms. Tjerandsen's findings, an ALJ may choose to credit testimony from teachers, administrators, or others who directly evaluate and observe a student over experts who base their opinions solely on documents.  *Crofts v. Issaquah School District No. 411*, 22 F.4th 1048, 1053-54 (9th Cir. 2022); *N.B. v. Hellgate Elementary Sch. Dist.*, 541 F.3d 1202, 1212 (9th Cir. 2008) (holding it was "reasonable for the hearing officer to rely on the testimony of [the school's] witnesses because they had observed [the student's] school performance" in contrast to

---

[3] Dr. Perlman defines orthography as "the manner in which letters and punctuation marks are used to form words. Components include letter patterns (graphemes), spelling (how letters and letter patterns are associated with speech sounds), punctuation, abbreviations, and special symbols."  (AR 1229).  Dr. Perlman testified that for students to have a dyslexia diagnosis, they must be deficient in one of three processes: orthography, phonology, and naming speed.  (AR 2495).

Plaintiffs also mischaracterize Dr. Perlman's report by stating that Dr. Perlman found ornthography to be "a significant and unserved area of deficit for C.D. in the 2020 IEP."  (Doc. 22-1 at 17).  Dr. Perlman wrote, however, that C.D. performed "Well Below Average" thereon.  (AR 1229).  Notably, he also testified he was not an interventionalist and therefore did not recommend or criticize any specific methodology C.D. received.  (AR 2005).

parents' expert witnesses who "based their opinions predominantly upon file reviews").  Ms. Tjerandsen testified that the District did not provide appropriate services for a student with dyslexia, though she was not qualified to diagnose dyslexia.  (AR 2006).  The ALJ found Ms. Tjerandsen's testimony unpersuasive, as she met C.D. once, remotely, in April 2022, more than nine months after C.D. left the District and more than one year after the District created his 2021 IEP.  (AR 2006).  While Ms. Tjerandsen testified that she assessed C.D. during her April 2022 meeting, she did not describe her testing, and there was no report submitted as evidence in this matter.  (AR 2006).  Nor was Ms. Tjerandsen familiar with the District's methodologies.  (AR 2006; 2737).  It is not clear how or why Ms. Tjerandsen concluded that C.D. struggled to decode words in the 2019-2020 school year when she evaluated him nearly two years later and after he switched schools (making it possible that he had regressed outside of the District).  Lastly, testimony from Ms. Hyde (C.D.'s inclusion teacher) is not inherently at odds with that of Ms. Rapisura.  Ms. Hyde wrote in January 2019 that C.D. struggled with decoding (AR 1568), and Ms. Rapisura testified that based on her memory, he could do so in 2019-2020.  (AR 3011) ("Q: So you're saying that he was able to decode at grade level as of the 2020 triennial?  A: He could read some grade level words, yes.").

Accordingly, the ALJ did not err by disregarding the District's "lack of appropriate training."

### b.  The ALJ's Decision is Not Contrary to Evidence of C.D.'s "Glaring Lack of Progress"

Plaintiffs argue the ALJ erroneously credited the District's self-serving statements and ignored C.D.'s glaring lack of progress.  (Doc. 22-1 at 18).  Plaintiffs argue the ALJ failed to appropriately scrutinize the District's progress data, particularly that collected during distance learning.  (*Id.* at 18-19).

An IEP must "aim to enable the child to make progress . . . After all, the essential function of an IEP is to set out a plan for pursuing academic and functional advancement." *Endrew F. ex rel. Joseph F. v. Douglas County School Dist. RE-1*, 580 U.S. 386, 399-90 (2017). "When reviewing whether a proposed educational setting is 'appropriate,' we employ the

'snapshot' rule, which instructs us to judge an IEP not in hindsight, but instead based on the information that was reasonably available to the parties at the time of the IEP." *Baquerizo v. Garden Grove Unified Sch. Dist.*, *826 F.3d 1179*, 1187 (9th Cir. 2016). A school district must "review, and where appropriate revise, each child's IEP at least annually." *R Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 182 (1982); *see also* 20 U.S.C. § 1414(d)(4)(A).

Plaintiffs largely rely on their own experts to demonstrate that C.D. had not made significant progress. As previously noted, the ALJ may credit testimony from teachers, administrators, and others who directly evaluate and observe a student over experts who base their opinions solely on documents. *Crofts*, 22 F.4th at1053-54; *N.B,*, 541 F.3d at 1212. Only one of Plaintiffs' experts (Dr. Perlman) met with C.D., and he provided no substantive criticisms of the District's 2020 or 2021 IEPs. The ALJ highlighted several ways C.D. had improved and how the District considered those improvements when formulating C.D.'s IEPs. For instance, C.D. met his 2020 reading fluency and reading comprehension which showed that he was able to read an unpracticed fifth-grade reading passage. This was a significant improvement from the 2020 IEP, where C.D. could only read a third-grade level passage. (AR 1880, 1995-1996).

While Plaintiff denounces the District's disregard for their expert Dr. Perlman, the District in fact increased its services to C.D. in response to Dr. Perlman's report at the 2021 meeting. As the Ninth Circuit has stated, the Court "can summarily dismiss Student's objections as impermissible attempts to second-guess the ALJ's characterization and weighing of the evidence," where a student merely disagrees with the ALJ's conclusion on the persuasive of expert testimony. *J.W. ex rel. J.E.W. v. Fresno Unified Sch. Dist.*, 626 F.3d 431, 446 (9th Cir. 2010) (refusing to question the ALJ's reliance on certain testimonies over others when reviewing the ALJ's findings). As such, the ALJ did not err in this respect.

### c. The ALJ Did Not Disregard Evidence Related to the District's Chosen Methodologies

Plaintiffs' final arguments related to the academic services proffered in C.D.'s 2020 and 2021 IEPs are largely reiterations of their previous argument that the ALJ improperly

17

disregarded the opinions of their experts.  To the extent Plaintiffs contend the ALJ should have credited their experts on the best methodologies to improve C.D.'s academic abilities, these arguments are, again, unavailing.  *J.W.*, 626 F.3d 446 ("This Court can summarily dismiss . . . Student's objections [related to weight given to various testimony] as impermissible attempts to second-guess the ALJ's characterization and weighing of the evidence.").

While Plaintiffs' experts suggested other teaching methodologies (such as the Orton-Gilingham-based teaching methods for dyslexia) would benefit C.D., a parent's disagreement with a chosen methodology is insufficient to establish an IDEA violation.  *Carlson v. San Diego Unified Sch. Dist.*, 380 F. App'x 595 (9th Cir. 2010).  Plaintiffs have not demonstrated this specific method was required for C.D. to receive a FAPE, and it is not the Court's position to decide which methodology is best.  "[C]ourts are ill-equipped to second-guess reasonable choices that school districts have made among appropriate instructional methods."  *J.L. v. Mercer Island Sch. Dist.*, 592 F.3d 938, 950 (9th Cir. 2010) (citation omitted); *R.P. ex rel. C.P. v. Prescott Unified Sch. Dist.*, 631 F.3d 1117, 1122 (9th Cir. 2011) ("The IDEA accords educators discretion to select from various methods for meeting the individualized needs of a student, provided those practices are reasonably calculated to provide him with educational benefit.").

As the record indicates, C.D. made progress toward his goals through the District's chosen, state-approved and evidence-based methodologies, including Read Naturally, Read 180, System 44, Fast Forward, Language Live!, Step Up to Writing, Excel Math, Touch Math, Moby Max, and Eureka Math.  Accordingly, the ALJ did not err by finding the District used adequate methodologies to address C.D.'s academic needs

### 4.    The District Provided Appropriate Goals, Supports, and Services for C.D.'s Behavioral Needs

Plaintiffs contend the ALJ erred because he was presented with "a significant increase" in C.D.'s disruptive behavior, but still found the District had provided a FAPE.  Plaintiff points to C.D.'s remote learning behavior as evidence the District failed to provide a FAPE, deeming it

"an explosion of disruptive and aggressive behaviors." (Doc. 22-1 at 21). Plaintiffs' citations do not suggest such a conclusion.

While it is true that C.D. struggled with remote learning, at least some of Plaintiffs' evidence is less severe. (*See, e.g.*, AR 1613 ["He seems to be off task with his thoughts a lot of the time, but I can usually guide him back around to what my point of the question is."].[4] Most concerning, of course, is that C.D.'s behavior turned physical during online learning. The parties dispute the best way to characterize these behaviors. For instance, Plaintiffs contend that C.D.'s behavior "metastasized into full-blown assaults of his own mother on camera in full view of District staff." (Doc. 27 at 13). The District counters that no witness described C.D.'s behavior as a "full-blown assault." Rather, other witnesses described the incident as C.D. pinching his mother. (AR 3028).

Setting aside how best to characterize this behavior, what is relevant is that the Court is to "judge an IEP not in hindsight, but instead based on the information that was reasonably available to the parties at the time of the IEP." *Baquerizo v. Garden Grove Unified School District*, 826 F.3d 1179, 1187 (9th Cir. 2016). Much of the evidence to which Plaintiffs cite demonstrates that C.D.'s behavior worsened during online learning prompted by COVID-19. (AR 1679 [noting that C.D. struggled with the online learning technology]; AR 1672 [finding that "C.D. is showing some major prompt dependence while being at home for too long . . ."]; AR 1716 [C.D. struggled with technical issues and larger class sizes]). Plaintiffs have not shown, however, that the District failed to construct a reasonable IEP based on the information available at the time. Natalie Libby, a board-certified behavior analyst, developed C.D.'s February 2020 IEP. Ms. Libby had assessed and observed C.D. on several occasions, and the District identified C.D.'s off-task and social behavior as areas of need. (AR 1115-16). Both goals were measurable and included baselines and benchmarks. (AR 1115-16). To support C.D.'s progress, the District provided an individual behavior aide for 210 minutes daily, monthly behavior supervision, and a BIP. (AR 1118-1119, 1084-1087). The District updated the BIP in

---

[4] Much of the evidence Plaintiffs cite, even assuming it does indeed demonstrate a regression in behavior, is from before the relevant time period beginning on April 6, 2021. (*See, e.g.*, Doc. 22-1 at 21, citing AR 911 [from March 2019]; AR 1019 [from March 2019]; AR 1590 [December 2019]; AR 1598 [February 2020]).

September 2020 to address C.D.'s behavior during remote learning.  (AR 1173-1177).  When C.D. returned to full-time in-person instruction, much of his behavioral issues (such as muting and unmuting himself or getting physical with his mother) were no longer relevant, and the District's primary concerns were his off-task behavior.

In the 2021 IEP, the District again updated C.D.'s performance in behavior and formulated four behavior goals (as opposed to the previous year's IEP, which included only two behavior goals) related to his social and classroom behavior.  (AR 1897-1900).  Those goals included the following:

1. By February 2022, when C.D. is presented with class work and/or an agenda, C.D. will use the tools given and other organizational skills to complete academic assignments (virtual zooms and/or in person) in a timely manner 80% of the time or better in a minimum of 6 environments (either in-person learning or distance learning) as measured by teacher and staff data collection, transition data and grade checks.

2. By February 2022, when presented with a class schedule and agenda, C.D. will use the tools given and other organizational skills to transition successfully between locations (virtual zooms and/or in person) in a timely manner 80% of the time or better in a minimum of 6 environments (either in-person learning or distance learning) as measured by teacher and staff data collection, transition data and grade checks.

3. By February 2022, when in the presence of peers (in person or virtually), C.D. will use social cues, reminders and his knowledge of respect, listening and other age appropriate social behavior, to be an active participant in social interactions and refrain from being disrespectful or [offensive] a minimum of 80% of opportunities across observed and reported interactions as measured by teacher and staff data collection.

4. By February 2022, while in the presence of others in classroom situations, including whole-group and small-groups including social skills group, in which waiting or listening is required, C.D. will refrain from outbursts or interrupting behavior and will use impulse control strategies (i.e. environmental cues, waiting, observing, using visual cues, listening, etc.) to refrain from interrupting and/or discussing topics that are irrelevant to the current situation/conversation a minimum of 75% of opportunities across environments for 4 or 5 observed days as measured by teacher and staff data collection.

(AR 1897-1900).  To help C.D. achieve these goals, the District provided an individual behavior aide for 210 minutes daily, behavior intervention services for 30 minutes monthly, inclusion

support, and a BIP, which amounted to an increase in behavioral support services.  (AR 1901-1902, 1909-1913).

Plaintiffs again rely on their own expert, Jeanine Wilkinson, to conclude the District failed to provide C.D. with appropriate behavior services.  As the ALJ noted, Ms. Wilkinson testified that C.D. had greater needs than those reported in his IEPs.  The ALJ, however, took issue with some of Ms. Wilkinson's testimony.  The ALJ highlighted that Ms. Wilkinson praised the District's behavior goals as "great" and suitably ambitious and that the District's preferred behavior testing tool was the "gold standard."  (AR 2019).  Ms. Wilkinson was unfamiliar with the District's services, as well as those offered by the individual behavior aide.  (AR 2018).  The ALJ instead relied upon testimony from the District's teachers, who testified that while C.D. required prompting and redirection, these services were adequately provided by C.D.'s aide.  (AR 2019).  The ALJ properly found, in sum, that the District properly assessed C.D.'s behavior needs, and the IEPs were reasonably calculated to provide a FAPE.

> **5.    The District Provided Appropriate Goals, Supports, and Services for C.D. in Executive Functioning**

Executive functioning "includes the ability to plan, organize, focus attention, and remember instructions.  For students, executive functioning impacts the ability to organize, complete and turn-in classwork and homework."  (AR 2020).

Plaintiffs contend the District failed to provide C.D. appropriate goals and programming to accommodate his executive functioning needs.  Most of Plaintiffs' arguments are conclusory and lack legal or evidentiary support.  For instance, Plaintiffs argue "Ms. Hyde was overtasked in having only 35 weekly service minutes for both pragmatics and executive functioning," without any support from either caselaw or Plaintiffs' experts.  (*See* Doc. 22-1 at 26, alleging the ALJ reached his conclusions without a preponderance of the evidence but without further elaborating). Plaintiffs also rely on testimony by their expert Sean McCormick, a former special-education teacher and consultant, in support of their contention that C.D.'s executive functioning goals were inappropriately drafted.  As the ALJ noted, Mr. McCormick met C.D. roughly nine months after he left the District.  Mr. McCormick assessed C.D. based on his own testing

methods that he was unable to clearly describe in his testimony.  Further, Mr. McCormick did not testify that the District provided inadequate services, despite Plaintiffs' allegations otherwise. Rather, Mr. McCormick largely testified that he might have made amendments to C.D.'s IEP. (*See, e.g.*, AR 2779 ("I think C.D. needed intensive one to one guidance from a credentialed education specialist . . . to help him develop an organization system that would allow him to track, manage, and complete assignments.  I think that would have helped spill over into different academic areas.")).

An ALJ does not err so long as the IEP is reasonable, even if other services may have been appropriate.  *Endrew*, 580 U.S. at 399.  ("Any review of an IEP must appreciate that the question is whether the IEP is reasonable, not whether the court regards it as ideal."). Accordingly, even if Mr. McCormick is correct that C.D. may have benefited from other services, that alone does not render the District's IEP unreasonable.  *Id.*

During C.D.'s 2020 IEP, the District found executive functioning to be an area of need and therefore developed a measurable goal to improve his ability to manage and prioritize tasks. (AR 1117).  The goals included a baseline and short-term objectives.  (AR 1117).  The 2020 IEP included a variety of services, including 180 minutes per month of inclusion services and 685 weekly minutes of SAI, to meet his 2020 IEP goals.  (AR 1118-19). At C.D.'s 2021 IEP, the District noted that he had made "huge gains" toward his executive functioning goal.  (AR 1889). In response, the District developed two measurable executive functioning goals to improve C.D.'s ability to use tools and organization skills to transition successfully between locations, and to timely complete academic assignments.  (AR 1899-1900). The goals included benchmarks and baselines, and they identified staff members responsible for helping C.D. meet this goal. (AR 1899-1900).  To help C.D. achieve these goals, the IEP teamed increased his Specialized Academic Instruction ("SAI").  (AR 1899-1900).  Because the IEP was reasonable, the ALJ did not err.

//

//

//

1

2

### 6.    The District Provided Appropriate Goals, Supports, and Services for C.D. in Pragmatic Language

Pragmatic language "refers to social language skills that are used in daily interactions with others.  Examples include conversational skills, non-verbal communication such as eye contact, understanding non-literal language, and understanding emotions." (AR 2023). Plaintiffs' contentions that the District failed to provide adequate services related to C.D.'s pragmatic language needs are unavailing.  Plaintiffs repeatedly contend that C.D. required direct speech support.  Although this is true, it ignores the fact that District provided this support through an inclusion teacher, as C.D. had demonstrated his ability to display the required pragmatic language skills in a 1:1 with the inclusion teacher; the District did not forgo speech support.  (AR 1863).  The ALJ relied upon testimony from both Ms. Perino and Ms. Hyde, who both worked directly with C.D. and found the District's services were adequate.

At C.D.'s 2020 IEP team meeting, the team noted C.D. had age-appropriate voice, articulation, and fluency.  (AR 1098).  C.D.'s social use of language, however, ranged from poor to average.  (AR 1098).  The IEP team continued to identify C.D. as a student with a pragmatic language disorder.  (AR 1098).  While C.D. appeared to understand what to do in situations, he did not always use these skills in his school life to the same degree as his peers.  (AR 1098).  In the 2020 IEP, the District included a measurable goal to improve C.D.'s pragmatic language skills, including his knowledge of perspective-taking, flexibility, ability to compromise with peers, and ability to self-advocate appropriately with peers.  (AR 1118).  To meet this goal, the IEP offered 45 minutes weekly of inclusion services, and annual supervision by the school's speech-language pathologist, along with an individual aide for prompting and redirection.  This in part was based on a recommendation by speech language pathologist Sara Perino, who noted that C.D.'s pragmatic language delays would be better addressed in a general education classroom, as C.D. needed to work on his pragmatic language skills with his peers.  (AR 2023). By the 2021 IEP, C.D. had progressed in perspective taking and social inferencing, though he did not meet his previous goal.  (AR 1887).  The IEP team developed three new measurable pragmatic language goals, which represented an increase in services from the previous IEP.  (AR

23

1896-1898).   As discussed above, the IEP was adequate with regard to C.D.'s pragmatic language needs, and the ALJ did not err.

      **7.**    **The District Provided Appropriate Goals, Supports, and Services for C.D. in Fine Motor Skills/Handwriting**

      Plaintiffs contend the District failed to provide fine motor/handwriting services to C.D., but Plaintiffs have failed to provide any evidence (other than samples of C.D.'s writing that they characterize as illegible) that C.D. required these interventions.   At his 2020 and 2021 IEP, the District noted that C.D.'s "gross and fine motor development appear to be progressing appropriately.   [C.D.] continues to require reminders about writing neater, smaller, and more legible."  (AR 1264, 1860).   At no point did C.D.'s parents or Dr. Perlman suggest that C.D. required a fine motor skills assessment.   Dr. Perlman noted that C.D.'s poor handwriting was attributable to his SLD.   (AR 1238, 2561).   There is evidence that C.D. struggled to take notes (*see, e.g.*, AR 1165), but C.D. struggled because he was distracted, not because he could not read his own writing.   Aspire assessed C.D.'s fine motor skills after he left the district and found his skills for handwriting were within the average performance range.  (AR 1941-46).   Plaintiffs have not established any reason for the ALJ to find that the District's failure to provide handwriting services to C.D. amounted to denying him a FAPE.

      Accordingly, the Court concludes that a preponderance of the evidence supports the ALJ's determination that the IEP was adequate and did not deny Plaintiff a FAPE.

**B.**    **Motion for Summary Judgment**

      **1.**    **Legal Standard**

      Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794.  "[T]here

1  is no significant difference in the analysis of rights and obligations created by the two Acts."

2  *Vinson v. Thomas*, 288 F.3d 1145, 1152 n. 7 (9th Cir. 2002).

3      "Congress has specifically and clearly provided that the IDEA coexists with the ADA

4  and other federal statutes, rather than swallowing the others."  *K.M. ex rel. Bright v. Tustin*

5  *Unified School Dist.*, 725 F.3d 1088, 1100 (9th Cir. 2013).  However, the Ninth Circuit has

6  stated "[N]othing in our holding should be understood to bar district courts from applying

7  ordinary principles of issue and claim preclusion in cases raising both IDEA and Title II claims

8  where the IDEA administrative appeals process has functionally adjudicated some or all

9  questions relevant to a Title II claim in a way that precludes relitigation."  *Id.*

10      "To state a prima facie case for a violation of Title II, a plaintiff must show: (1) he is a

11  qualified individual with a disability; (2) he was either excluded from participation in or denied

12  the benefits of a public entity's services, programs, or activities, or was otherwise discriminated

13  against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by

14  reason of his disability."  *Payan v. Los Angeles Community College District*, 11 F.4th 729, 377

15  (9th Cir. 2021) (internal quotation marks and citations omitted).  The ADA requires that the

16  discrimination occur "by reason of disability," which requires that the plaintiff show "that

17  discrimination on the basis of the disability was a 'motivating factor' for the decision[,]" whereas

18  "the Rehabilitation Act is even stricter, requiring a plaintiff to show a denial of services 'solely

19  by reason of' disability."  *K.M.*, 725 F.3d at 1099 (9th Cir. 2013) (internal citation and quotation

20  marks omitted).  To prove a Section 504 claim, a plaintiff must also prove the program receives

21  federal financial assistance.  *Id.*  To recover damages under Section 504, "plaintiffs must prove a

22  mens rea of 'intentional discrimination' . . . [and] that standard may be met by showing

23  'deliberate indifference,' . . . not only by showing 'discriminatory animus.'"  *Mark H. v.*

24  *Lemahieu*, 513 F.3d 922, 925 (9th Cir. 2008) (quoting *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124,

25  1138 (9th Cir. 2001).

26  //

27  //

28  //

### 2. Analysis

The District contends that it is entitled to summary judgment because Plaintiffs cannot show C.D. was subject to discrimination.  (Doc. 20 at 25).  Plaintiffs' sole argument against summary judgment on their remaining claims is the following:

> Factually, as identified above, Ms. Escarcega only offered Ms. Daily a "sheet of tips" and her e-mail address rather than any formal "parent counseling and training" to address C.D.'s violent behaviors at home.  Ample evidence demonstrates the District's knowing concern that was he was at an imminent "breaking point."  Yet, since the District indisputably failed to provide any appropriate in-person or remote services (e.g., parent consultation) to address this, there is a genuine issue of material fact that the District was deliberately indifferent to C.D.'s impaired inability to access his education in an equal manner to his non-disabled peers.

(Doc. 27 at 17).

First, to the extent that Plaintiffs contend that the District discriminated against C.D. by failing to offer him a FAPE, the evidence reflects and the Court has held otherwise.  The Ninth Circuit, among others, has found that the doctrine of issue preclusion applies "in cases raising both IDEA and Title II [of the Americans with Disabilities Act (ADA)] claims where the IDEA administrative appeals process has functionally adjudicated some or all questions relevant to a Title II claim."  *K.M.*, 725 F.3d at 1101; *see also Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 297 (5th Cir. 2005) ("Because [plaintiffs'] claims under the ADA and § 504 [of the Rehabilitation Act] are factually and legally indistinct from his IDEA claims, issue preclusion is proper in this case."); *Indep. Sch. Dist. No. 283 v. S.D. by J.D.*, 88 F.3d 556, 562 (8th Cir. 1996) ("When [the IDEA appeal] process produces an administrative decision that is upheld on judicial review under IDEA, principles of issue and claim preclusion may properly be applied to short-circuit redundant claims under other laws.").  Therefore, because Plaintiffs cannot establish that the District failed to offer C.D. a FAPE, his remaining claims that rely on that finding fail as a matter of law.  *K.M.*, 725 F.3d at 1101.

To the extent that Plaintiffs remaining claims are distinct from their IDEA claims, they have failed to identify how the District discriminated against C.D. and that the District did so with a discriminatory motive.  For instance, Plaintiffs do not allege other students received in-

person or remote services that C.D. did not.  Even if the Court reads Plaintiffs' complaint and other arguments to suggest that the District may have failed to provide a reasonable accommodation for C.D. or instituted a policy with a disparate impact on students with disabilities,[5] Plaintiffs have demonstrated no triable issue on whether the District did so either intentionally or with deliberate indifference, which forecloses their recovery. *See Mark H.,* 513 F.3d at 937–38.  "Deliberate indifference requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that the likelihood." *Duvall v. County of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001) (citing *City of Canton v. Harris*, 489 U.S. 378, 389 (1988)).  As the Ninth Circuit has noted,

> Because in some instances events may be attributable to bureaucratic slippage that constitutes negligence rather than deliberate action or inaction, we have stated that deliberate indifference does not occur where a duty to act may simply have been overlooked, or a complaint may reasonably have been deemed to result from events taking their normal course.  Rather, in order to meet the second element of the deliberate indifference test, a failure to act must be a result of conduct that is more than negligent, and involves an element of deliberateness.

*Duvall*, 260 F.3d at 1139.  Plaintiffs have simply not identified any facts to suggest the District acted with the requisite intent.  Plaintiffs' *entire* argument rests on the assumption that by providing Ms. Daily with a tip sheet to help address C.D.'s behavior at home, the District was deliberately indifferent to his federal rights.  This argument, however, does not identify (1) to what sort of accommodation or other action C.D. was entitled, or (2) how this amounted to more than "bureaucratic slippage," or any negligence, at a time when the District worked to school C.D. remotely.  *Duvall*, 260, F.3d at 1139.  Therefore, their claims under the ADA, the Rehabilitation Act and Section 504's implementing regulations fail as a matter of law.  *Mark H.,* 513 F.3d at 937–38.  Accordingly, the District's motion for summary judgment is GRANTED with respect to Counts Two, Three, and Four.

---

[5] Under the ADA and the Rehabilitation Act, a plaintiff can demonstrate disability discrimination in the provision of either (i) discrimination based on disparate treatment or impact, or (ii) denial of reasonable modifications or accommodations.  *See Fortyune v. Am. Multi–Cinema, Inc.*, 364 F.3d 1075, 1086 (9th Cir. 2004); *Dunlap v. Ass'n of Bay Area Gov'ts*, 996 F.Supp. 962, 965 (N.D. Cal. 1998) ("[T]he ADA not only protects against disparate treatment, it also creates an affirmative duty in some circumstances to provide special, preferred treatment, or 'reasonable accommodation.'")

1

2                                    **V.      CONCLUSION**

3          Based on the foregoing, Plaintiffs' motion to supplement the administrative record (Doc.

4   21) is GRANTED IN PART and DENIED IN PART.  Plaintiffs' motion for summary judgment

5   is DENIED (Doc. 22). The District's motion for summary judgment is GRANTED (Doc. 20).

6   The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant and against

7   Plaintiffs.  Accordingly, the trial set for September 10, 2024, is VACATED, and the Clerk of

8   Court is directed to close this case.

9

10  IT IS SO ORDERED.

11

12  Dated:   **July 18, 2024**                              */s/ Sheila K. Oberto*
                                                  UNITED STATES MAGISTRATE JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

28